**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. ______________**

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY CO.,

Plaintiffs,

**Jury Trial Demand**

vs.

GTD MEDICAL AND REHABILITATION CENTER, INC, KESNEL THEUS, SAINTLOUITANE THEUS, ORIENTALOS VOLMAR, D.C., SELEST HEALTH CENTER, INC., and ROSE AUGUSTIN, A.P.R.N.,

Defendants.
_______________________________________/

**COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1. This action seeks to recover more than $3,570,000.00 that the respective Defendants wrongfully obtained from Plaintiffs by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants GTD Medical and Rehabilitation Center, Inc ("GTD Medical") and Selest Health Center, Inc. ("Selest") (collectively the "Clinic Defendants") for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including examinations and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided

to Florida automobile accident victims who were eligible for coverage under GEICO PIP insurance policies ("Insureds").

2. In addition, Plaintiffs seek a declaration that they are not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent and unlawful PIP claims that the respective Defendants have submitted through the Clinic Defendants, because of the fraudulent and unlawful activities described herein.

3. As set forth herein, Defendants never were entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs, because:

(i) at all relevant times, Defendants operated in violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"); and (c) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), thereby rendering Defendants ineligible to collect PIP insurance benefits, and rendering Defendants' PIP insurance charges noncompensable and unenforceable;

(ii) the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat the insureds who purportedly received and were subjected to the Fraudulent Services;

(iii) in many cases, the Fraudulent Services were never legitimately provided at all;

(iv) Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, results, and medical necessity of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO;

(v) Defendants unlawfully billed GEICO for "physical therapy" services performed by unlicensed and unsupervised individuals; and

(vi) Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and the billing was submitted in violation of the requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

4. As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

5. Defendants at all relevant times have known that they were not entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs because of the fraudulent and unlawful activities described herein.

6. The charts attached hereto as Exhibits "1" and "2" set forth large and representative samples of the fraudulent and unlawful claims that have been identified to date that Defendants submitted through the Clinic Defendants to GEICO by mail.

7. Defendants' interrelated fraudulent and unlawful schemes began no later than 2020. As a result of Defendants' fraudulent and unlawful schemes, GEICO has incurred damages of more than $3,570,000.00.

## THE PARTIES

### I. Plaintiffs

8. Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II. Defendants

9. Defendant GTD Medical is a Florida corporation that purported to provide Fraudulent Services from the following locations: (i) 1195 N Military Trail, Suite 5B, West Palm Beach, Florida 33409; (ii) 17325 NW 27th Avenue, Miami Gardens, Florida, 33056; (iii) 2914 N State Road 7, Margate, Florida 33063; (iv) 3845 Beck Blvd, Suite 828, Naples, Florida 34114; (v) 3939 S Congress Avenue, Lake Worth Beach, Florida 33461; and (vi) 401 S 25th Street, Fort

Pierce, Florida 34947. GTD Medical was incorporated in Florida on or about January 17, 2014, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

10. Between at least January 2020 and April 10, 2025, GTD Medical falsely purported to be wholly owned and controlled by a physician, Jean-Marie Gregoire Eugene, M.D. ("Eugene"), and between April 11, 2025 and the present, GTD Medical falsely purported to be wholly owned and controlled by a chiropractor, Defendant Orientalos Volmar, D.C. ("Volmar"). In actuality, however, at all relevant times GTD Medical was secretly owned and controlled by Defendants Kesnel Theus ("K. Theus") and Saintlouitane Theus ("S. Theus"), who are licensed to practice acupuncture, but are not licensed as physicians, dentists, or chiropractors.

11. Volmar resides in and is a citizen of Florida and was licensed to practice chiropractic in Florida on November 24, 2015. Between April 11, 2025 and the present, Volmar falsely purported to be the sole owner of GTD Medical and used GTD Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12. K. Theus resides in and is a citizen of Florida, and is licensed to practice acupuncture, but is not a licensed physician, dentist, or chiropractor. K. Theus secretly owned and controlled GTD Medical and used GTD Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

13. S. Theus resides in and is a citizen of Florida, and is licensed to practice acupuncture, but is not a licensed physician, dentist, or chiropractor. S. Theus secretly owned and controlled GTD Medical and used GTD Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers. Upon information and belief based on public records, S. Theus and K. Theus are family members.

14. Defendant Selest is a Florida corporation that purported to provide Fraudulent Services from 16601 NE 6th Avenue, Miami, Florida 33162. Selest was incorporated in Florida on or about January 24, 2000, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

15. At all relevant times, Selest falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact was not operated in compliance with the Clinic Act and instead was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

16. Defendant Rose Augustin, A.P.R.N. ("Augustin") resides in and is a citizen of Florida. At all relevant times, Augustin owned and controlled Selest and used Selest as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

**III. <u>Other Relevant Individuals</u>**

17. Although not named as Defendants in this action, Eugene and Harry Jean, A.P.R.N. ("Jean") are relevant to understanding Plaintiffs' claims in this action.

18. Eugene was licensed to practice medicine in Florida in 1983 and died on or about April 10, 2025. Prior to his death, Eugene falsely purported to be the sole owner of GTD Medical, falsely purported to serve as medical director at Selest, and purported to perform many of the Fraudulent Services that were billed through GTD Medical and Selest to GEICO, at the direction of GTD Medical, K. Theus, S. Theus, Selest, and Augustin, respectively.

19. Jean was licensed as an advanced practice registered nurse in Florida in 2015 and purported to perform many of the Fraudulent Services that were billed through GTD Medical to GEICO, at the direction of GTD Medical, K. Theus, and S. Theus.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

21. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

22. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I. Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

24. Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

25. Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

26. In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

27. Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

28. Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

29. Pursuant to the Clinic Act, and subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a "clinic" in Florida. The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

30. However, the Clinic Act provides an exemption from the clinic licensing requirements for certain health care practices that are "wholly owned" by licensed health care practitioners, specifically:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners …, and that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license …

31. Therefore, in order for a health care practice to qualify for this "wholly owned" exemption from the Clinic Act's clinic licensing requirements, the practice not only must be

"wholly owned" by a licensed health care practitioner (or a practitioner together with their immediate family members), but the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to supervise the business activities of the practice and remain legally responsible for the clinic's compliance with federal and state laws.

32. Furthermore, in order for a health care practice to qualify for the "wholly owned" exemption from the Clinic Act's licensing requirements, the practice may not provide services that are outside of the scope of the supervising practitioner-owner's professional license.

33. Pursuant to the No-Fault Law, a "wholly owned" practice may not recover PIP Benefits unless it is "wholly owned" by a physician, dentist, or chiropractor, or by a physician, dentist, chiropractor, together with their spouse, parent, child, or sibling.

34. Pursuant to the No-Fault Law, and subject to certain exceptions that are inapplicable in this case, a practice owned by acupuncturists or advanced practice registered nurses – in whole or in part – may not collect PIP Benefits unless it obtains a clinic license.

35. Pursuant to the Clinic Act, an applicant for a clinic license must – among other things – submit financial statements to the AHCA to demonstrate that they have sufficient assets, credit, and projected revenues to cover clinic startup costs, liabilities, and expenses. Applicants who cannot demonstrate proof of their financial ability to operate a clinic will be unable to obtain a clinic license.

36. Pursuant to the Clinic Act, every clinic operating in Florida must appoint a physician as medical director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

37. Pursuant to the Clinic Act, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery

of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

38. In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

39. Moreover, a clinic medical director must serve as the records owner for the clinic, and – in that capacity – must, among other things: (i) develop and implement policies, standards, and procedures to protect the confidentiality and security of patient records at the clinic; (ii) ensure that clinic employees are trained in such policies, standards, and procedures; and (iii) be responsible for maintaining a record of all disclosures of information contained in clinic patients' medical records to third parties, including the purpose of the disclosure requests.

40. Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

41. Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

42. Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not

entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

43. Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

44. Pursuant to the No-Fault Law, "medically necessary" means:

> a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the convenience of the patient, physician, or other health care provider.

45. Pursuant to the Physical Therapy Act, unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

46. Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any physical therapy services that are unlawfully performed by unlicensed and unsupervised personnel.

47. Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i) for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii) to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii) with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

48. The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

49. The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

50. To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

51. Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the practitioner who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

52. Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

53. Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving or failing to make a good-faith effort to collect co-payments or deductibles from patients with PIP insurance.

54. Failure to make a legitimate effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

## II. The Defendants' Interrelated Fraudulent and Unlawful Schemes

55. Beginning no later than 2020, Defendants devised and implemented interrelated fraudulent and unlawful schemes pursuant to which they billed GEICO – and, upon information and belief as set forth herein, other insurers as well – millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

56. In the claims identified in Exhibits "1" and "2", almost none of the Insureds whom the respective Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor automobile accidents they experienced that would necessitate the treatments that the Defendants purported to provide.

57. Even so, in the claims identified in Exhibits "1" and "2", the respective Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that Defendants could submit to insurers – including GEICO – rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to this "treatment".

58. Defendants provided their pre-determined and fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" and "2" without regard for the Insureds' individual

symptoms or presentation – or, in most cases, the absence of any significant continuing medical problems arising from any actual automobile accidents.

59. Each step in Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting Defendants to generate and falsely justify the maximum amount of fraudulent and unlawful PIP billing for each Insured.

60. No legitimate physician, chiropractor, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described herein to proceed under their auspices.

61. Defendants permitted the fraudulent treatment and billing protocols described herein to proceed under their auspices because Defendants sought to profit from the fraudulent and unlawful billing that they submitted through the respective Clinic Defendants to GEICO and other insurers.

### A. GTD Medical, K. Theus, S. Theus, and Volmar's Violations of the Clinic Act and Misrepresentations Regarding GTD Medical's Eligibility to Receive PIP Reimbursement

62. In or around late 2013-early 2014, K. Theus and S. Theus sought to own a health care practice that they could use to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other insurers.

63. However, K. Theus and S. Theus had a significant record of indebtedness and financial distress – including recent bankruptcy filings in which they had reported more than $1,000,000.00 in debt – that they knew would preclude them from demonstrating the assets, credit, and financial ability necessary to obtain a clinic license.

64. As licensed acupuncturists, K. Theus and S. Theus could own and operate a "wholly owned" practice without a clinic license or medical director. However, K. Theus and S. Theus knew that – pursuant to the Clinic Act and No-Fault Law – any such practice would be unable to provide health care services other than acupuncture services, and any such practice would be ineligible to receive PIP insurance reimbursement because it would be "wholly owned" by acupuncturists, rather than by physicians, dentists, or chiropractors.

65. Accordingly, in or around late 2013-early 2014, K. Theus and S. Theus recruited Eugene, who – in exchange for compensation from K. Theus, S. Theus, and GTD Medical – agreed to, and did, falsely pose as the sole owner of GTD Medical, in order to create the false appearance that GTD Medical both qualified for the "wholly owned" exemption from the Clinic Act's clinic licensing requirements, and was eligible to receive PIP insurance reimbursement.

66. Eugene was amenable to participation in K. Theus, S. Theus, and GTD Medical's scheme because he had been subjected to professional discipline that precluded him from finding legitimate, sufficiently-remunerative employment as a physician, had an extensive history of financial distress, including large tax liens, civil judgments, and a bankruptcy, and needed to generate income.

67. Following Eugene's death in April 2025, K. Theus and S. Theus needed to find a physician, dentist, or chiropractor who could replace Eugene and falsely pose as the sole owner of GTD Medical, and thereby maintain the false appearance that GTD Medical qualified for the "wholly owned" exemption from the Clinic Act's clinic licensing requirements, and was eligible to receive PIP insurance reimbursement.

68. Accordingly, in or around April 2025, K. Theus and S. Theus recruited Volmar, a chiropractor who – in exchange for compensation from K. Theus, S. Theus, and GTD Medical –

agreed to, and did, falsely pose as the sole owner of GTD Medical, in order to maintain the false appearance that GTD Medical both qualified for the "wholly owned" exemption from the Clinic Act's clinic licensing requirements, and was eligible to receive PIP insurance reimbursement.

69. Upon information and belief based on publicly-available information, Volmar was amenable to participation in K. Theus, S. Theus, and GTD Medical's scheme because he was in financial distress as the result of unpaid tax obligations and needed to generate income.

70. Though Eugene and then Volmar falsely posed as the sole owners of GTD Medical in exchange for compensation from K. Theus and S. Theus, in actuality K. Theus and S. Theus – at all relevant times – secretly owned and controlled GTD Medical.

71. In keeping with the fact that K. Theus and S. Theus – rather than Eugene and Volmar – were the true owners of GTD Medical: (i) it was K. Theus who first incorporated GTD Medical; (ii) K. Theus was GTD Medical's registered agent at all relevant times; (iii) at all relevant times, K. Theus and S. Theus were listed as GTD Medical's "vice presidents" in GTD Medical's corporate filings; (iv) K. Theus signed many of GTD Medical's annual reports; (v) K. Theus and S. Theus arranged for Volmar to replace Eugene as GTD Medical's purported sole owner within weeks of Eugene's death; (vi) following Eugene's death, K. Theus and S. Theus continued to be listed as GTD Medical's "vice presidents", and K. Theus continued to be listed as GTD Medical's registered agent, despite the fact that Volmar supposedly had assumed sole ownership of the practice from Eugene; and (vii) K. Theus and S. Theus represented themselves to be owners of GTD Medical in GTD Medical tax filings.

72. K. Theus and S. Theus paid Eugene and then Volmar to falsely pose as the sole owners of GTD Medical in order to do indirectly what they were forbidden from doing directly – namely, to own and operate a Florida health care practice that could obtain PIP insurance

reimbursement without obtaining a clinic license and without retaining a physician to perform the required duties of a clinic medical director at GTD Medical's practice locations.

73. Furthermore, GTD Medical could only qualify for the "wholly owned" exemption from the Clinic Act's clinic licensing requirements if it were owned by a licensed health care practitioner who legitimately supervised its business activities and remained legally responsible for its compliance with all federal and state laws.

74. However, neither K. Theus, S. Theus, Eugene, Volmar, nor any other licensed health care practitioner ever legitimately supervised the business activities of GTD Medical, inasmuch as it was used to engage in the fraudulent and unlawful conduct described herein.

75. In fact, K. Theus and S. Theus could not legitimately have supervised the business activities at GTD Medical in the first place, because it purported to provide health care services, including physical therapy services, chiropractic services, and medical services, that were outside the scope of K. Theus and S. Theus' acupuncture licenses.

76. GTD Medical was owned and controlled by K. Theus and S. Theus. GTD Medical did not have any valid exemption from the Clinic Act's clinic licensing requirements, it did not have a clinic license, and it was ineligible to collect PIP reimbursement in the first place.

77. Even so, in all of the claims identified in Exhibit "1", GTD Medical, K. Theus, S. Theus, and Volmar falsely represented that GTD Medical was eligible to receive PIP reimbursement, when in fact it was not.

**B. Selest and Augustin's Violations of the Clinic Act and Misrepresentations Regarding Selest's Eligibility to Receive PIP Reimbursement**

78. Because Augustin owned Selest and was an advanced practice registered nurse – rather than a physician, chiropractor, or dentist – she could not use Selest as a vehicle to submit PIP insurance billing unless she obtained a clinic license for Selest, and unless Selest employed a

licensed physician as its medical director, who actually performed the required duties of clinic medical director.

79. However, if Augustin retained a legitimate physician to serve as the medical director for Selest, any such legitimate physician actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the fraudulent and unlawful scheme that Augustin and Selest intended to carry out.

80. Accordingly, in or around 2016, Augustin recruited Eugene, who – in exchange for compensation from Augustin and Selest – agreed to, and did, falsely pose as the medical director of Selest, without actually performing the required duties of a clinic medical director at Selest.

81. Eugene was amenable to participation in Augustin and Selest's scheme because he had been subjected to professional discipline that precluded him from finding legitimate, sufficiently-remunerative employment as a physician, had an extensive history of financial distress, including large tax liens, civil judgments, and a bankruptcy, and needed to generate income.

82. Eugene never legitimately served as the medical director of Selest.

83. Instead, from the beginning of Eugene's association with Selest, he ceded all day-to-day decision-making and oversight regarding health care services at the clinics, and the resulting billing, to Augustin.

84. In keeping with the fact that Eugene was never the genuine medical director at Selest, Eugene never legitimately conducted systematic reviews of Selest's billings to ensure that the billings were not fraudulent or unlawful, and instead permitted Selest to operate in the fraudulent and unlawful manner described herein.

85. What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Eugene never provided legitimate, day-to-day supervision at Selest, and was only occasionally present at Selest's offices, if at all.

86. Because Selest operated in violation of the Clinic Act, without a legitimate medical director who actually performed the required duties of a clinic medical director, it was never eligible to collect PIP reimbursement.

87. Even so, in all of the claims identified in Exhibit "2", Selest and Augustin falsely represented that Selest was eligible to receive PIP reimbursement, when in fact it was not.

**C. Defendants' Fraudulent and Unlawful Charges for Initial Examinations**

88. As an initial step in Defendants' fraudulent treatment and billing protocols, many of the Insureds in the claims identified in Exhibit "1" purportedly received an initial examination at GTD Medical, and many of the Insureds in the claims identified in Exhibit "2" purportedly received an initial examination at Selest.

89. In the claims identified in Exhibit "1", GTD Medical, K. Theus, S. Theus, and Volmar then billed the initial examinations to GEICO under CPT code 99203, typically resulting in a charge of $300.00 or $320.00 for each initial examination that they purported to provide.

90. In the claims identified in Exhibit "2", Selest and Augustin then billed the initial examinations to GEICO under CPT code 99203, typically resulting in a charge of $300.00 for each initial examination that they purported to provide.

91. In the claims for initial examinations identified in Exhibits "1" and "2", the charges for the purported initial examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

92. In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, because they operated the respective Clinic Defendants in violation of Florida law.

93. Moreover, and as set forth herein, the charges for initial examinations identified in Exhibits "1" and "2" also were fraudulent in that they misrepresented the nature, extent, and results of the purported initial examinations.

94. As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

95. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

96. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the examining practitioner either: (i) engaged in legitimate "low complexity" medical decision-making in connection with the examination; or (ii) spent at least 30 minutes of time performing the underlying examination.

97. By contrast, and as set forth herein, in the claims for initial examinations that are identified in Exhibits "1" and "2", the examining health care practitioners neither engaged in legitimate "low complexity" medical decision-making in connection with the examinations, nor spent at least 30 minutes of time performing the examinations.

98. In this context, and pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

99. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

100. For an initial patient examination to legitimately entail "low complexity" medical decision-making so as to be billable under CPT code 99203, the examination must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

101. To the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any presenting problems at all as the result of their typically minor automobile accidents, however, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

102. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" and "2" either had no presenting problems at all as the result of their minor automobile accidents, or else had problems of minimal severity, in most of the claims identified in Exhibits "1" and "2", the Insureds did not seek treatment at any hospital as the result of their accidents.

103. To the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital following their accidents, they almost always were briefly

observed on an outpatient basis, and were discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

104. Furthermore, in most of the claims identified in Exhibits "1" and "2", the contemporaneous police reports indicate that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

105. In actuality, the purported initial examinations in the claims identified in Exhibits "1" and "2" did not involve any legitimate medical decision-making at all.

106. For instance, in the claims for initial examinations identified in Exhibits "1" and "2": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, patient histories, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the examining health care practitioners at the Clinic Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

107. Instead, in the claims for initial examinations identified in Exhibits "1" and "2", the respective Defendants – and the examining practitioners working under their direction – provided substantially similar, false, objectively unverifiable soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual circumstances or presentation.

108. For example:

(i) On February 7, 2021, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured as a result of the accident. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on February 11, 2021, Eugene purported to conduct an initial examination of JL at GTD Medical. To the extent that Eugene performed the

examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of GTD Medical, K. Theus, and S. Theus – provided JL with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by GTD Medical, K. Theus, S. Theus, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JL. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii) On June 21, 2021, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured as a result of the accident. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on June 21, 2021, Eugene purported to conduct an initial examination of AC at Selest. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of Selest and Augustin – provided AC with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AC's presenting problems, nor the treatment plan provided to AC by Selest, Augustin, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, AC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Selest, Augustin, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AC. Even so, Selest and Augustin billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii) On October 28, 2021, an Insured named NN was involved in an automobile accident. The contemporaneous police report indicated NN's vehicle was drivable following the accident. The police report further indicated that NN was not injured as a result of the accident. In keeping with the fact that NN was not seriously

injured, NN did not visit any hospital emergency room following the accident. To the extent that NN experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on October 29, 2021, Eugene purported to conduct an initial examination of NN at Selest. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of Selest and Augustin – provided NN with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither NN's presenting problems, nor the treatment plan provided to NN by Selest, Augustin, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, NN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Selest, Augustin, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to NN. Even so, Selest and Augustin billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv) On June 6, 2022, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated LJ's vehicle was drivable following the accident. The police report further indicated that LJ was not injured as a result of the accident. In keeping with the fact that LJ was not seriously injured, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on June 8, 2022, Eugene purported to conduct an initial examination of LJ at GTD Medical. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of GTD Medical, K. Theus, and S. Theus – provided LJ with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither LJ's presenting problems, nor the treatment plan provided to LJ by GTD Medical, K. Theus, S. Theus, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, LJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LJ. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v) On June 27, 2022, an Insured named DH was involved in an automobile accident. The contemporaneous police report indicated DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured as a result of the accident. In keeping with the fact that DH was not seriously injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on June 28, 2022, Eugene purported to conduct an initial examination of DH at GTD Medical. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of GTD Medical, K. Theus, and S. Theus – provided DH with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DH's presenting problems, nor the treatment plan provided to DH by GTD Medical, K. Theus, S. Theus, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, DH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DH. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi) On January 18, 2023, an Insured named KJ was involved in an automobile accident. The contemporaneous police report indicated KJ's vehicle was drivable following the accident. The police report further indicated that KJ was not injured as a result of the accident. In keeping with the fact that KJ was not seriously injured, KJ did not visit any hospital emergency room following the accident. To the extent that KJ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on January 19, 2023, Eugene purported to conduct an initial examination of KJ at GTD Medical. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of GTD Medical, K. Theus, and S. Theus – provided KJ with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither KJ's presenting problems, nor the treatment plan provided to KJ by GTD Medical, K. Theus, S. Theus, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, KJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical,

K. Theus, S. Theus, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KJ. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii) On April 10, 2023, an Insured named LI was involved in an automobile accident. The contemporaneous police report indicated LI's vehicle was drivable following the accident. The police report further indicated that LI was not injured as a result of the accident. In keeping with the fact that LI was not seriously injured, LI did not visit any hospital emergency room following the accident. To the extent that LI experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on April 18, 2023, Eugene purported to conduct an initial examination of LI at Selest. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of Selest and Augustin – provided LI with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither LI's presenting problems, nor the treatment plan provided to LI by Selest, Augustin, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, LI did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Selest, Augustin, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LI. Even so, Selest and Augustin billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii) On May 8, 2023, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured as a result of the accident. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 19, 2023, Eugene purported to conduct an initial examination of NC at Selest. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of Selest and Augustin – provided NC with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither NC's presenting problems, nor

the treatment plan provided to NC by Selest, Augustin, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, NC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Selest, Augustin, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to NC. Even so, Selest and Augustin billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix) On July 21, 2023, an Insured named FJ was involved in an automobile accident. The contemporaneous police report indicated FJ's vehicle was drivable following the accident. The police report further indicated that FJ was not injured as a result of the accident. In keeping with the fact that FJ was not seriously injured, FJ did not visit any hospital emergency room following the accident. To the extent that FJ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on July 25, 2023, Eugene purported to conduct an initial examination of FJ at Selest. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of Selest and Augustin – provided FJ with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither FJ's presenting problems, nor the treatment plan provided to FJ by Selest, Augustin, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, FJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Selest and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FJ. Even so, Selest and Augustin billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x) On October 27, 2023, an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated BA's vehicle was drivable following the accident. The police report further indicated that BA was not injured as a result of the accident. In keeping with the fact that BA was not seriously injured, BA did not visit any hospital emergency room following the accident. To the extent that BA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on October 30, 2023, Eugene purported to conduct an initial examination of BA at GTD Medical. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of GTD Medical, K. Theus,

and S. Theus – provided BA with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither BA's presenting problems, nor the treatment plan provided to BA by GTD Medical, K. Theus, S. Theus, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, BA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to BA. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi) On April 5, 2024, an Insured named FS was involved in an automobile accident. The contemporaneous police report indicated FS's vehicle was drivable following the accident. The police report further indicated that FS was not injured as a result of the accident. In keeping with the fact that FS was not seriously injured, FS did not visit any hospital emergency room following the accident. To the extent that FS experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on April 8, 2024, Jonathan Rodriguez, D.C. ("Rodriguez") purported to conduct an initial examination of FS at GTD Medical. To the extent that Rodriguez performed the examination in the first instance, Rodriguez did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rodriguez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Rodriguez – at the direction of GTD Medical, K. Theus, and S. Theus – provided FS with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither FS's presenting problems, nor the treatment plan provided to FS by GTD Medical, K. Theus, S. Theus, and Rodriguez, presented any risk of significant complications, morbidity, or mortality. To the contrary, FS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Rodriguez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FS. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rodriguez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii) On April 20, 2024, an Insured named DP was involved in an automobile accident. The contemporaneous police report indicated DP's vehicle was drivable following the accident. The police report further indicated that DP was not injured as a result of the accident. In keeping with the fact that DP was not seriously injured, DP did not visit any hospital emergency room following the accident. To the extent that DP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on April 30, 2024, Henri Claude Douze, D.C. ("Douze")

purported to conduct an initial examination of DP at GTD Medical, and on July 17, 2024, Eugene purported to conduct an initial examination of DP at GTD Medical. To the extent that Douze and Eugene performed the examinations in the first instance, Douze and Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, Douze and Eugene did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, Douze and Eugene – at the direction of GTD Medical, K. Theus, and S. Theus – provided DP with the false list of objectively unverifiable soft tissue injury "diagnoses" that they provided to other Insureds. Furthermore, neither DP's presenting problems, nor the treatment plan provided to DP by GTD Medical, Douze, Eugene, K. Theus, and S. Theus presented any risk of significant complications, morbidity, or mortality. To the contrary, DP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, Douze, Eugene, K. Theus, and S. Theus consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DP. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examinations using CPT code 99203, and thereby falsely represented that Douze and Eugene engaged in some legitimate, low complexity medical decision-making during the purported examinations.

(xiii) On January 21, 2025, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured as a result of the accident. In keeping with the fact that GH was not seriously injured, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on January 21, 2025, Eugene purported to conduct an initial examination of GH at GTD Medical. To the extent that Eugene performed the examination in the first instance, Eugene did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eugene did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eugene – at the direction of GTD Medical, K. Theus, and S. Theus – provided GH with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither GH's presenting problems, nor the treatment plan provided to GH by GTD Medical, K. Theus, S. Theus, and Eugene, presented any risk of significant complications, morbidity, or mortality. To the contrary, GH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Eugene consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GH. Even so, GTD Medical, K. Theus, and S. Theus billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eugene engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv) On May 13, 2025, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured as a result of the accident. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on May 19, 2025, Douze purported to conduct an initial examination of OD at GTD Medical. To the extent that Douze performed the examination in the first instance, Douze did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Douze did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Douze – at the direction of GTD Medical, K. Theus, S. Theus, and Volmar – provided OD with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither OD's presenting problems, nor the treatment plan provided to OD by GTD Medical, K. Theus, S. Theus, and Douze, presented any risk of significant complications, morbidity, or mortality. To the contrary, OD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Douze consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OD. Even so, GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Douze engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv) On August 5, 2025, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured as a result of the accident. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on August 8, 2025, Jean purported to conduct an initial examination of JP at GTD Medical. To the extent that Jean performed the examination in the first instance, Jean did not retrieve, review, or analyze any significant number of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Jean did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Jean – at the direction of GTD Medical, K. Theus, S. Theus, and Volmar – provided JP with the false list of objectively unverifiable soft tissue injury "diagnoses" that they provided to other Insureds. Furthermore, neither JP's presenting problems, nor the treatment plan provided to JP by GTD Medical, K. Theus, S. Theus, and Jean, presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by GTD Medical, K. Theus, S. Theus, and Jean consisted of medically unnecessary physical therapy

services, which did not pose the least bit of risk to JP. Even so, GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Jean engaged in some legitimate, low complexity medical decision-making during the purported examination.

109. These are only representative examples. In the claims for initial examinations identified in Exhibits "1" and "2", the respective Defendants routinely falsely represented that the examinations entailed legitimate, low complexity medical decision-making, when in fact they did not.

110. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

111. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

112. As set forth above, in the claims identified in Exhibits "1" and "2", almost all of the Insureds who purportedly received treatment from the Defendants were involved in relatively minor accidents.

113. It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer substantially identical injuries as the result of their accidents or require a substantially identical course of treatment.

114. It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the exact same date after their underlying automobile accident.

115. It is even more improbable – to the point of impossibility – that this would occur with regularity within a cohort of patients treating at individual practices such as the Clinic Defendants.

116. Even so, in keeping with the fact that their putative "diagnoses" were false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the Defendants routinely issued substantially identical, false "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

117. For example:

(i) On June 21, 2021, two Insureds – AC and DJ – were involved in the same automobile accident. Thereafter, both Insureds presented at Selest for initial examinations on the exact same date, June 21, 2021. AC and DJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AC and DJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Selest and Augustin caused AC and DJ to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ii) On May 13, 2022, two Insureds – MP and GS – were involved in the same automobile accident. Thereafter, both Insureds presented at Selest for initial examinations on the exact same date, May 16, 2022. MP and GS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MP and GS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Selest and Augustin caused MP and GS to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iii) On March 26, 2024, three Insureds – BJ, CJ, and SJ – were involved in the same automobile accident. Thereafter, all three Insureds presented at GTD Medical for initial examinations on the exact same date, April 1, 2024. BJ, CJ, and SJ were different ages, in different physical conditions, located in different positions in the

vehicle, and experienced the impact from different positions in the vehicle. To the extent that BJ, CJ, and SJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, and S. Theus caused BJ, CJ, and SJ to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iv) On April 29, 2024, three Insureds – AM, DM, and DM – were involved in the same automobile accident. Thereafter, all three Insureds presented at GTD Medical for initial examinations on the exact same date, May 2, 2024. AM, DM, and DM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AM, DM, and DM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, and S. Theus caused AM, DM, and DM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(v) On August 21, 2024, three Insureds – EC, MP, and CS – were involved in the same automobile accident. Thereafter, all three Insureds presented at GTD Medical for initial examinations on the exact same date, August 22, 2024. EC, MP, and CS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EC, MP, and CS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, and S. Theus caused EC, MP, and CS to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vi) On August 2, 2025, five Insureds – LD, JN, DS, OS, and SS – were involved in the same automobile accident. Thereafter, LD and OS presented at GTD Medical for initial examinations on August 6, 2025, JN and DS presented at GTD Medical for initial examinations on August 7, 2025, and SS presented at GTD Medical for an initial examination on August 8, 2025. LD, JN, DS, OS, and SS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LD, JN, DS, OS, and SS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, S. Theus, and Volmar caused LD, JN, DS, OS, and SS to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vii) On September 17, 2025, four Insureds – BB, BB, JB, and AC – were involved in the same automobile accident. Thereafter, all four Insureds presented at GTD Medical for initial examinations on the exact same date, September 19, 2025. BB, BB, JB, and AC were different ages, in different physical conditions, located in

different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BB, BB, JB, and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, S. Theus, and Volmar caused BB, BB, JB, and AC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(viii) On September 30, 2025, three Insureds – MA, AM, and BM – were involved in the same automobile accident. Thereafter, all three Insureds presented at GTD Medical for initial examinations on the exact same date, October 2, 2025. MA, AM, and BM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MA, AM, and BM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, S. Theus, and Volmar caused MA, AM, and BM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ix) On October 13, 2025, two Insureds – JM and EP – were involved in the same automobile accident. Thereafter, both Insureds presented at Selest for initial examinations on the exact same date, October 16, 2025. JM and EP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JM and EP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Selest and Augustin caused JM and EP to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(x) On November 23, 2025, two Insureds – AC and MC – were involved in the same automobile accident. Thereafter, both Insureds presented at GTD Medical for initial examinations on the exact same date, December 1, 2025. AC and MC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AC and MC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, GTD Medical, K. Theus, S. Theus, and Volmar caused AC and MC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

118. In the claims for initial examinations that are identified in Exhibits "1" and "2", the Defendants frequently caused the issuance of substantially similar "diagnoses", on or about the

same date, to more than one Insured involved in a single accident, and caused the Insureds to be recommended a substantially similar course of medically unnecessary "treatment", despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

119. The Defendants routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

120. In the claims for initial examinations identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the putative examinations involved legitimate, low complexity medical decision-making in order to create a false basis to bill for the initial examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

121. Moreover, in the claims for initial examinations identified in Exhibits "1" and "2", neither Eugene nor any other health care practitioner at the Clinic Defendants spent even 15 minutes performing the examinations, much less 30 minutes.

122. For instance, and in keeping with the fact that the initial examinations that supposedly were provided through the Clinic Defendants did not take more than 15 minutes to perform, the Defendants used pre-printed, checklist forms in purporting to provide the initial examinations.

123. The checklist forms that the Defendants used in purporting to provide the initial examinations set forth only a limited range of examination parameters.

124. The only time spent performing the examinations that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

125. These brief interviews and limited examinations did not require Eugene or any other health care practitioner associated with the Clinic Defendants to spend more than 15 minutes performing the purported examinations.

126. In fact, it would be impossible for Eugene to have spent more than 15 minutes performing the purported examinations because on individual dates, he simultaneously purported to perform or directly supervise an impossible number of physical therapy and other services, oftentimes at multiple locations a considerable distance away from each other.

127. For example:

(i) On August 24, 2021, Selest and Augustin billed GEICO under CPT code 99203 for an initial examination that Eugene supposedly performed on an Insured named MD. That same day, the Defendants also collectively billed GEICO for more than 16 hours of physical therapy and related services that Eugene also purported to perform or directly supervise at GTD Medical's West Palm Beach location, and at Selest's Miami location.

(ii) On May 16, 2022, Selest and Augustin billed GEICO under CPT code 99203 for initial examinations that Eugene supposedly performed on Insureds named MP and GS, and GTD Medical, K. Theus, and S. Theus billed GEICO under CPT code 99203 for an initial examination that Eugene supposedly performed on an Insured named DJ. That same day, the Defendants also collectively billed GEICO for more than 37 hours of physical therapy and related services that Eugene also purported to perform or directly supervise at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location.

(iii) On January 22, 2024, Selest and Augustin billed GEICO under CPT code 99203 for an initial examination that Eugene supposedly performed on an Insured named JD. That same day, the Defendants also collectively billed GEICO for more than 21 hours of physical therapy and related services that Eugene also purported to perform or directly supervise at GTD Medical's West Palm Beach, Miami Gardens, Margate, and Naples locations, and at Selest's Miami location.

(iv) On March 20, 2024, GTD Medical, K. Theus, and S. Theus billed GEICO under CPT code 99203 for an initial examination that Eugene supposedly performed on an Insured named CM. That same day, the Defendants also collectively billed GEICO for more than 29 hours of physical therapy and related services that Eugene also purported to perform or directly supervise at GTD Medical's West Palm Beach and Naples locations, and at Selest's Miami location.

(v) On May 10, 2024, GTD Medical, K. Theus, and S. Theus billed GEICO under CPT code 99203 for initial examinations that Eugene supposedly performed on Insureds named EC and FP. That same day, the Defendants also collectively billed GEICO for more than 38 hours of physical therapy and related services that Eugene also purported to perform or directly supervise at GTD Medical's West Palm Beach, Miami Gardens, Margate, and Naples locations, and at Selest's Miami location.

128. These are only representative examples. In the claims identified in Exhibits "1" and "2", the respective Defendants routinely falsely represented that Eugene had spent at least 30 minutes of time performing initial examinations, when in fact Eugene could not legitimately have spent at least 30 minutes of time performing the examinations, considering the volume of services he was simultaneously purporting to perform or directly supervise on those same dates, typically at multiple, far-flung locations.

129. Moreover, the purported initial examinations in the claims identified in Exhibits "1" and "2" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require Eugene or any other examining health care practitioners to spend more than 15 minutes performing the supposed examinations.

130. In the claims for initial examinations identified in Exhibits "1" and "2", the Defendants routinely misrepresented the amount of time that was spent conducting the initial

examinations because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

131. In the claims for initial examinations identified in Exhibits "1" and "2", the respective Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii) Defendants were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in violation of Florida law.

**D. Defendants' Fraudulent and Unlawful Charges for Physical Therapy Services**

132. In addition to their fraudulent and unlawful examinations, the respective Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibits "1" and "2" to weeks of medically unnecessary and illusory physical therapy treatment.

133. GTD Medical, K. Theus, S. Theus, and Volmar typically billed the purported physical therapy services to GEICO under:

(i) CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $30.96 for each round of mechanical traction they purported to provide;

(ii) CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $107.72 for each round of therapeutic exercise they purported to provide;

(iii) CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $72.00 for each round of neuromuscular reeducation they purported to provide;

(iv) CPT code 97140 for putative manual therapy, typically resulting in a charge of $60.00 for each round of manual therapy they purported to provide; and

(v) CPT code 97032 for putative manual electric stimulation, typically resulting in a charge of $40.00 for each round of manual electric stimulation treatment they purported to provide.

134. In the claims identified in Exhibit "2", Selest and Augustin typically billed the purported physical therapy services to GEICO under:

(i) CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide;

(ii) CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $60.00 for each round of therapeutic exercise they purported to provide;

(iii) CPT code 97039, for putative unlisted therapeutic exercises, typically resulting in a charge of $20.00 for each round of therapeutic exercise they purported to provide;

(iv) CPT code 97010 for putative hot/cold pack treatment, typically resulting in a charge of $20.00 for each round of hot/cold pack treatment they purported to provide; and

(v) Health Care Common Procedure Coding System code S8948 for putative low level laser treatment, typically resulting in a charge of $80.00 for each round of low level laser treatment they purported to provide.

135. In the claims for purported physical therapy services identified in Exhibits "1" and "2", the charges for the physical therapy services were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

136. In fact, the Defendants were never eligible to collect PIP Benefits, because they engaged in the fraudulent and unlawful conduct described herein.

137. In the claims for "physical therapy" services identified in Exhibits "1" and "2", the services also unlawfully were performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals.

138. Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by unlicensed and unsupervised individuals.

139. As a result, and in order to conceal the fact that unlicensed and unsupervised individuals performed the purported physical therapy services that were unlawfully billed through the Clinic Defendants to GEICO, Defendants deliberately omitted any reference to the unlicensed and unsupervised individuals associated with the Clinic Defendants on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

140. Instead, in the claims for physical therapy services identified in Exhibit "1", GTD Medical, K. Theus, and S. Theus – prior to Eugene's death in April 2025 – routinely and falsely listed Eugene in Box 31 of the HCFA-1500 forms as the practitioner who supposedly performed or directly supervised the physical therapy services.

141. Likewise, in the claims for physical therapy services identified in Exhibit "2", Selest and Augustin – prior to Eugene's death in April 2025 – routinely and falsely listed Eugene in Box 31 of the HCFA-1500 forms as the practitioner who supposedly performed or directly supervised the physical therapy services.

142. In fact, Eugene – who on individual dates was simultaneously purporting to perform or directly supervise an impossible number of physical therapy and other services, oftentimes at multiple locations a considerable distance away from each other – did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibits "1" and "2" and could not have legitimately performed or directly supervised the physical therapy services.

143. For example:

(i) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 25 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on June 9, 2022.

(ii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 36 hours of purported physical therapy services that Eugene

supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on November 14, 2022.

(iii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 30 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on January 19, 2023.

(iv) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 28 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on January 27, 2023.

(v) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 18 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach and Naples locations, and at Selest's Miami location, on March 9, 2023.

(vi) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 19 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach and Naples locations, and at Selest's Miami location, on August 24, 2023.

(vii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 17 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's Margate and Naples locations, and at Selest's Miami location, on August 31, 2023.

(viii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 21 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach and Naples locations, and at Selest's Miami location, on October 27, 2023.

(ix) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 21 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Miami Gardens, and Naples locations, and at Selest's Miami location, on February 6, 2024.

(x) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 24 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on February 7, 2024.

(xi) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 35 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Miami Gardens, and Naples locations, and at Selest's Miami location, on March 12, 2024.

(xii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 35 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach and Naples locations, and at Selest's Miami location, on March 26, 2024.

(xiii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 33 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Miami Gardens, and Naples locations, and at Selest's Miami location, on April 24, 2024.

(xiv) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 29 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Miami Gardens, and Naples locations, and at Selest's Miami location, on May 7, 2024.

(xv) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 41 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on May 20, 2024.

(xvi) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 40 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on May 31, 2024.

(xvii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin collectively billed GEICO for more than 30 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's

West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on June 5, 2024.

(xviii) GTD Medical, K. Theus, S. Theus, Selest, and Augustin billed GEICO for more than 36 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Margate, and Naples locations, and at Selest's Miami location, on June 20, 2024.

(xix) GTD Medical, K. Theus, S. Theus, Selest, and Augustin billed GEICO for more than 21 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Miami Gardens, and Naples locations, and at Selest's Miami location, on August 19, 2024.

(xx) GTD Medical, K. Theus, S. Theus, Selest, and Augustin billed GEICO for more than 40 hours of purported physical therapy services that Eugene supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach, Miami Gardens, and Naples locations, and at Selest's Miami location, on August 26, 2024.

144. These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" and "2", GTD Medical, K. Theus, S. Theus, Selest, and Augustin, respectively, routinely falsely represented that Eugene had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, typically at multiple locations a considerable distance away from each other.

145. It is impossible that Eugene routinely performed or directly supervised such a high volume of services, typically at multiple, distant locations, on individual dates.

146. Furthermore, upon information and belief, the fraudulent billing for physical therapy services that the respective Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

147. GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

148. It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that they did not simultaneously bill other automobile insurers.

149. Thus, upon information and belief, the impossible number of physical therapy services that Eugene purported to perform or directly supervise for GEICO Insureds at the Clinic Defendants on individual dates of service constituted only a fraction of the total number of physical therapy services that Eugene purported to perform or directly supervise on those same dates of service.

150. In the claims for physical therapy services identified in Exhibits "1" and "2", GTD Medical, K. Theus, S. Theus, Selest, and Augustin, respectively, routinely falsely represented that Eugene had personally performed or directly supervised the services in order to conceal the fact that the services had been unlawfully performed – to the extent that they were performed at all – by unlicensed and unsupervised personnel.

151. Following Eugene's death in April 2025, GTD Medical, K. Theus, S. Theus, and Volmar continued to unlawfully bill GEICO – and, upon information and belief, other insurers as well – for physical therapy services performed by unlicensed and unsupervised personnel.

152. To conceal their continued, unlawful billing for physical therapy services performed by unlicensed and unsupervised personnel, in mid-2025 GTD Medical, K. Theus, S. Theus, and Volmar began to falsely represent that Jean, an advanced practice registered nurse, and Volmar, a chiropractor, personally performed or directly supervised many of the purported physical therapy services that were billed through GTD Medical to GEICO.

153. In fact, Jean and Volmar – who on individual dates were simultaneously purporting to perform or directly supervise an impossible number of physical therapy and other services – did

not legitimately perform or directly supervise the physical therapy services that were billed under their names and license numbers in the claims identified in Exhibit "1" and could not have legitimately performed or directly supervised the physical therapy services.

154. For example:

(i) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 20 hours of purported physical therapy services that Jean supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach location on August 25, 2025.

(ii) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 17 hours of purported physical therapy services that Jean supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach location on August 29, 2025.

(iii) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 17 hours of purported physical therapy services that Jean supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach location on September 11, 2025.

(iv) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 22 hours of purported physical therapy services that Jean supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach location on September 15, 2025.

(v) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 21 hours of purported physical therapy services that Jean supposedly personally performed, or at least directly supervised, at GTD Medical's West Palm Beach location on September 17, 2025.

(vi) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 21 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples location on September 29, 2025.

(vii) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 33 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples and Miami Gardens locations on October 1, 2025.

(viii) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 21 hours of purported physical therapy services that Jean supposedly personally

performed, or at least directly supervised, at GTD Medical's West Palm Beach location on October 20, 2025.

(ix) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 29 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples and Miami Gardens locations on October 23, 2025.

(x) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 21 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples and Miami Gardens locations on October 27, 2025.

(xi) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 26 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples and Miami Gardens locations on November 14, 2025.

(xii) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 22 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples and Miami Gardens locations on November 21, 2025.

(xiii) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 22 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples location on December 23, 2025.

(xiv) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 18 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples location on March 5, 2026.

(xv) GTD Medical, K. Theus, S. Theus, and Volmar billed GEICO for more than 20 hours of purported physical therapy services that Volmar supposedly personally performed, or at least directly supervised, at GTD Medical's Naples location on March 18, 2026.

155. These are only representative examples. In the claims for physical therapy services from the period between mid-2025 and the present that are identified in Exhibit "1", GTD Medical, K. Theus, S. Theus, and Volmar routinely falsely represented that Jean and Volmar had performed

– or at least directly supervised – an impossible number of physical therapy services on individual dates.

156. It is impossible that Jean and Volmar routinely performed or directly supervised such a high volume of services on individual dates.

157. Furthermore, upon information and belief, the fraudulent billing for physical therapy services that GTD Medical, K. Theus, S. Theus, and Volmar submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

158. Thus, upon information and belief, the impossible number of physical therapy services that Jean and Volmar purported to perform or directly supervise for GEICO Insureds at GTD Medical on individual dates of service constituted only a fraction of the total number of physical therapy services that Jean and Volmar purported to perform or directly supervise on those same dates of service.

159. In the claims for physical therapy services identified in Exhibit "1", GTD Medical, K. Theus, S. Theus, and Volmar, routinely falsely represented that Jean and Volmar had personally performed or directly supervised the services in order to conceal the fact that the services had been unlawfully performed – to the extent that they were performed at all – by unlicensed and unsupervised personnel.

160. In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

161. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

162. Moreover, in a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

163. Even so, and in keeping with the fact that the purported physical therapy services that were billed through the Clinic Defendants to GEICO were not medically necessary, and were unlawfully performed by unlicensed and unsupervised personnel, Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

164. There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

165. However, the respective Defendants routinely purported to provide the same handful of physical therapy "treatments" to the Insureds in the claims identified in Exhibits "1" and "2", on substantially the same schedule, without regard for the Insureds' individual circumstances.

166. Moreover, in the claims identified in Exhibits "1" and "2", the respective Defendants routinely caused Insureds to immediately begin a medically unnecessary course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

167. Defendants routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents because their putative examinations involved no legitimate medical decision-making and had pre-determined outcomes, and because Defendants used unlicensed and unsupervised personnel to perform the purported physical therapy services, in contravention of Florida law.

168. In the claims for physical therapy services identified in Exhibits "1" and "2", Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii) the services were performed – to the extent that they were performed at all – by unlicensed and unsupervised personnel;

(iii) the billing for the services misrepresented the identities of the actual treating practitioners, to fraudulently conceal the fact that the services had been performed, if at all, by unlicensed and unsupervised personnel; and

(iv) Defendants were never eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they operated in violation of Florida law.

**E. Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect PIP Deductibles from Their Patients**

169. Defendants knew that, if they made a legitimate, good-faith effort to collect deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful schemes described herein. For instance, if Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Clinic Defendants' offices for medically unnecessary treatment.

170. Accordingly, as part and parcel of their fraudulent and unlawful schemes, Defendants unlawfully engaged in the general business practice of waiving – or failing to make a

good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

171. In keeping with this fact, in almost all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through the respective Clinic Defendants to GEICO for Defendants' Fraudulent Services, Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

172. In the claims identified in Exhibits "1" and "2", Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

## III. The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO

173. To support their fraudulent charges, Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO seeking payment for the Fraudulent Services that Defendants were not entitled to receive.

174. The claims that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i) The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that Defendants were in compliance with Florida law, and therefore were eligible to collect PIP Benefits in the first instance. In fact, Defendants were never in compliance with Florida law, and were never eligible to collect PIP Benefits.

(ii) The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement.

(iii) The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Defendants, not to provide medically necessary treatment to the Insureds.

(iv) The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services that purportedly were provided.

## IV. <u>Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

175. Defendants were legally and ethically obligated to act honestly and with integrity in connection with their provision of the Fraudulent Services and their submission of charges to GEICO.

176. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

177. For instance, Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

178. Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and frequently were never performed in the first instance.

179. Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by unlicensed and unsupervised individuals and unlawfully billed to GEICO.

180. Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

181. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,570,000.00.

182. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against GTD Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

183. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-182, above.

184. There is an actual case in controversy between GEICO and GTD Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

185. GTD Medical has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

186. GTD Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

187. GTD Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

188. GTD Medical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

189. GTD Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

190. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that GTD Medical has no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against K. Theus, S. Theus, and Volmar**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

191. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-182, above.

192. GTD Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

193. K. Theus, S. Theus, and Volmar knowingly conducted and/or participated, directly or indirectly, in the conduct of GTD Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon

the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that GTD Medical was not eligible to receive under the No-Fault Law because: (i) GTD Medical unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

194. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

195. GTD Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which K. Theus, S. Theus, and Volmar operated GTD Medical, inasmuch as GTD Medical was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for GTD Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through GTD Medical to the present day.

196. GTD Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by GTD Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

197. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,300,000.00 pursuant to the fraudulent bills submitted through GTD Medical.

198. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**<u>THIRD CAUSE OF ACTION</u>**
**Against K. Theus, S. Theus, and Volmar**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

199. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-182, above.

200. GTD Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

201. K. Theus, S. Theus, and Volmar were employed by, or associated with, the GTD Medical enterprise.

202. K. Theus, S. Theus, and Volmar have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of GTD Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that GTD Medical

was not eligible to receive under the No-Fault Law, because: (i) GTD Medical unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

203. K. Theus, S. Theus, and Volmar knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

204. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,300,000.00 pursuant to the fraudulent bills submitted through the GTD Medical enterprise.

205. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against GTD Medical, K. Theus, S. Theus, and Volmar**
**(Common Law Fraud)**

206. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-182, above.

207. GTD Medical, K. Theus, S. Theus, and Volmar intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through GTD Medical for the Fraudulent Services.

208. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that GTD Medical was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

209. GTD Medical, K. Theus, S. Theus, and Volmar intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through GTD Medical that were not reimbursable.

210. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $3,300,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through GTD Medical.

211. GTD Medical, K. Theus, S. Theus, and Volmar's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

212. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against GTD Medical, K. Theus, S. Theus, and Volmar**
**(Under Fla. Stat. § 501.201 et. seq.)**

213. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-182, above.

214. GTD Medical, K. Theus, S. Theus, and Volmar are actively engaged in trade and commerce in the State of Florida.

215. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203. GTD Medical, K. Theus, S. Theus, and Volmar engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

216. The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) GTD Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were

medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

217. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of GTD Medical, K. Theus, S. Theus, and Volmar has been materially injurious to GEICO and its Insureds.

218. The conduct of GTD Medical, K. Theus, S. Theus, and Volmar was the actual and proximate cause of the damages sustained by GEICO.

219. GTD Medical, K. Theus, S. Theus, and Volmar's unfair and deceptive acts have caused GEICO to sustain damages of at least $3,300,000.00.

220. By reason of GTD Medical, K. Theus, S. Theus, and Volmar's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Against GTD Medical, K. Theus, S. Theus, and Volmar**
**(Unjust Enrichment)**

221. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-182, above.

222. As set forth above, GTD Medical, K. Theus, S. Theus, and Volmar have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

223. When GEICO paid the bills and charges submitted by K. Theus, S. Theus, and Volmar through GTD Medical, it reasonably believed that it was legally obligated to make such payments based on GTD Medical, K. Theus, S. Theus, and Volmar's improper, unlawful, and/or unjust acts.

224. GTD Medical, K. Theus, S. Theus, and Volmar have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that GTD Medical, K. Theus, S. Theus,

and Volmar voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

225. GTD Medical, K. Theus, S. Theus, and Volmar's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

226. By reason of the above, GTD Medical, K. Theus, S. Theus, and Volmar have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,300,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Selest**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

227. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-182, above.

228. There is an actual case in controversy between GEICO and Selest regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

229. Selest has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

230. Selest has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

231. Selest has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

232. Selest has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

233. Selest has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

234. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Selest has no right to receive payment for any pending bills submitted to GEICO.

## EIGHTH CAUSE OF ACTION
**Against Augustin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

235. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-182, above.

236. Selest is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

237. Augustin knowingly has conducted and/or participated, directly or indirectly, in the conduct of Selest's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Selest was not eligible to receive under the No-Fault Law because: (i) Selest unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were

provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

238. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit “2”.

239. Selest’s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Augustin operated Selest, inasmuch as Selest was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Selest to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

240. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $268,000.00 pursuant to the fraudulent bills submitted through Selest.

241. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys’ fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**<u>NINTH CAUSE OF ACTION</u>**
**Against Selest and Augustin**
**(Common Law Fraud)**

242. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-182, above.

243. Selest and Augustin intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Selest for the Fraudulent Services.

244. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Selest was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

245. Selest and Augustin intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Selest that were not reimbursable.

246. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $268,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Selest.

247. Selest and Augustin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

248. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Selest and Augustin**
**(Under Fla. Stat. § 501.201 et. seq.)**

249. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-182, above.

250. Selest and Augustin are actively engaged in trade and commerce in the State of Florida.

251. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203. Selest and Augustin engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

252. The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Selest's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

253. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Selest and Augustin has been materially injurious to GEICO and its Insureds.

254. The conduct of Selest and Augustin was the actual and proximate cause of the damages sustained by GEICO.

255. Selest and Augustin's unfair and deceptive acts have caused GEICO to sustain damages of at least $268,000.00.

256. By reason of Selest and Augustin's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**Against Selest and Augustin**
**(Unjust Enrichment)**

257. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-182, above.

258. As set forth above, Selest and Augustin have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

259. When GEICO paid the bills and charges submitted by Augustin through Selest, it reasonably believed that it was legally obligated to make such payments based on Selest and Augustin's improper, unlawful, and/or unjust acts.

260. Selest and Augustin have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Selest and Augustin voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

261. Selest and Augustin's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

262. By reason of the above, Selest and Augustin have been unjustly enriched in an amount to be determined at trial, but in no event less than $268,000.00.

**JURY DEMAND**

263. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A. On the First Cause of Action against GTD Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that GTD Medical has no right to receive payment for any of the pending bills submitted to GEICO.

B. On the Second Cause of Action against K. Theus, S. Theus, and Volmar, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C. On the Third Cause of Action against K. Theus, S. Theus, and Volmar, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

D. On the Fourth Cause of Action against GTD Medical, K. Theus, S. Theus, and Volmar, compensatory damages in an amount to be determined at trial but in excess of $3,300,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

E. On the Fifth Cause of Action against GTD Medical, K. Theus, S. Theus, and Volmar, compensatory damages in an amount to be determined at trial but in excess of $3,300,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

F. On the Sixth Cause of Action against GTD Medical, K. Theus, S. Theus, and Volmar, more than $3,300,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G. On the Seventh Cause of Action against Selest, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Selest has no right to receive payment for any of the pending bills submitted to GEICO.

H. On the Eighth Cause of Action against Augustin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $268,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

I. On the Ninth Cause of Action against Selest and Augustin, compensatory damages in an amount to be determined at trial but in excess of $268,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

J. On the Tenth Cause of Action against Selest and Augustin, compensatory damages in an amount to be determined at trial but in excess of $268,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

K. On the Eleventh Cause of Action against Selest and Augustin, more than $268,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: August 19, 2026

*/s/ Max Gershenoff*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, Florida 32207

and

926 RXR Plaza
Uniondale, New York 11556-0926
Phone: (904) 791-8948
Facsimile: (904) 598-6225
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com

*Counsel for Plaintiffs*